# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

STEVE HOLLAND,                                  Case No. 1:11-cv-849
     Plaintiff,                               Barrett, J.
                                                Litkovitz, M.J.

     vs.

COMMISSIONER OF                                 **REPORT AND**
SOCIAL SECURITY,                                **RECOMMENDATION**
     Defendant.

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications for disability insurance benefits (DIB) and supplemental security income (SSI).   This matter is before the Court on plaintiff's Statement of Errors (Doc. 11), the Commissioner's response in opposition (Doc. 15), and plaintiff's reply memorandum.   (Doc. 16).

## I.  Procedural Background

Plaintiff filed applications for DIB and SSI in September 2009, alleging disability since December 31, 2006, due to Alpha-1 antitrypsin deficiency[1], back problems, emphysema, depression and bipolar disorder.   (Tr. 202).   Plaintiff's applications were denied initially and upon reconsideration.   Plaintiff, through counsel, requested and was granted a de novo hearing before ALJ Deborah Smith.   Plaintiff, medical expert (ME) Dr. Mary Buban, Psy.D., and a vocational expert (VE) appeared and testified at the ALJ hearing.   On January 21, 2011, the ALJ

---

[1] Alpha-1 antitrypsin deficiency is an inherited disorder that may cause lung disease and liver disease. http://ghr.nlm.nih.gov/condition/alpha-1-antitrypsin-deficiency (last accessed January 21, 2013).   This deficiency is a condition in which the body does not make enough of a protein that protects the lungs and liver from damage. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001178.

issued a decision denying plaintiff's DIB and SSI applications. Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a)

(4)(i)-(v), 404.1520(b)-(g)).   The claimant has the burden of proof at the first four steps of the

sequential evaluation process.  *Id.; Wilson v. Commissioner,* 378 F.3d 541, 548 (6th Cir. 2004).

Once the claimant establishes a prima facie case by showing an inability to perform the relevant

previous employment, the burden shifts to the Commissioner to show that the claimant can

perform other substantial gainful employment and that such employment exists in the national

economy.  *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

### B.    The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The [plaintiff] met the insured status requirements of the Social Security Act
> through March 31, 2008, but not thereafter.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since December
> 31, 2006, the alleged onset date (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments when considered in
> combination: alpha-1-antitrypsin deficiency requiring weekly IV infusion at home;
> low back pain; and pain in the left shoulder; mood disorder; probable prescription
> drug abuse; and a respiratory impairment (20 C.F.R. 404.1520(c) and 416.920(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that
> meets or medically equals one of the listed impairments in 20 C.F.R. Part 404,
> Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d),
> 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the [ALJ] finds that the
> [plaintiff] has the residual functional capacity to perform a range of light work as
> defined in 20 CFR 404.1567(b) and 416.967(b).   The [plaintiff] is capable of
> lifting up to 20 pounds occasionally and 10 pounds frequently; sitting for up to 6
> hours in an 8-hour workday; and standing or walking about 6 hours in an 8-hour
> workday. The [plaintiff] can perform occasional balancing, stooping, kneeling,

3

crouching, and climbing of ramps or stairs; but is precluded from climbing ladders, ropes, or scaffolds. The [plaintiff] must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, and all exposure to hazardous machinery or unprotected heights. Due to mental impairments, the [plaintiff] is limited to occasional contact with supervisors. The [plaintiff] is precluded from contact with the general public and from work involving strict production quotas and time standards.

6. The [plaintiff] is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).[4]

7. The [plaintiff] was born [in] . . . 1966 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from December 31, 2006 through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(Tr. 18-31).

### C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.*

---

[4]Plaintiff's past relevant work was as a tile setter and carpenter. (Tr. 30).

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007)). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Specific Errors**

On appeal, plaintiff argues that: (1) the ALJ erred in finding "probable prescription drug abuse" to be a "medically determinable" and "severe" impairment; (2) the ALJ improperly

5

weighed the opinions of plaintiff's treating providers; (3) the ALJ unfairly "picked and chose" the evidence that supported her conclusions; and (4) the ALJ erred in rendering an RFC finding that is tainted by her misunderstanding of the medical issues in this case and is not supported by the evidence of record.

### 1. The ALJ's finding that "probable prescription drug abuse" is a severe impairment.

Plaintiff alleges that the ALJ erred by finding "probable prescription drug abuse" to be a "medically determinable" and "severe" impairment. (Doc. 11 at 13). Plaintiff asserts there is no evidence of record to support the ALJ's finding that "probable prescription drug abuse" is a "medically determinable impairment" in this case because no physician of record ever diagnosed him with or suspected him of an addiction to or dependence upon prescription drugs and, in fact, several medical providers expressly stated they saw no evidence of drug use or abuse. Plaintiff also contends that the ALJ did not cite any evidence to show that plaintiff's supposed prescription drug abuse was "severe" in the sense that it impacted plaintiff's ability to work in any manner. Plaintiff further alleges that the ALJ's unsubstantiated finding of a severe "probable prescription drug abuse" impairment was not harmless error as it adversely affected her assessment of whether plaintiff's subjective complaints of pain were credible, her determination of the limiting effects of his impairments, and ultimately the RFC finding.

Substantial evidence supports the ALJ's finding of probable prescription drug abuse. (Tr. 19). The ALJ set forth the following chronology of plaintiff's medical visits and requests for pain medication in support of her finding of possible drug seeking behavior:

6

- 3/08 – Plaintiff received Oxycodone in the emergency room for back pain and requested a refill from his primary care provider. (Tr. 381)
- 4/08 – Plaintiff called his treating physician again to request "the strong" Vicodin at the same time plaintiff was taking muscle relaxers and Ibuprofen. (Tr. 379)
- 7/08 – Plaintiff reported that the prescribed pain medication was not effective and he requested a muscle relaxer. (Tr. 377)
- 9/08 – Plaintiff requested a prescription for Percocet. (Tr. 371)
- 12/08 – Plaintiff requested pain medication for his low back pain, alleging that Ibuprofen was not helping. (Tr. 372)
- 1/09 – Plaintiff alleged he flushed the Vicodin he had received down the toilet because "they weren't helping." (Tr. 371)
- 8/09 – Plaintiff visited the emergency room twice in one week for complaints of back pain and was given Percocet; he returned to his primary care physician just a few days later and requested another prescription for Percocet. (Tr. 362, 364)
- 9/09 – Plaintiff went to the emergency room for back pain after he experienced a "pop," and he was prescribed Percocet. (Tr. 518)
- 9/09 – Plaintiff returned to the emergency room approximately two weeks later reporting flare-ups of his back pain, but the attending physician reported that plaintiff did not appear to be in acute distress and he was able to move and roll to his side fairly easily; plaintiff was noted to have filled a prescription for Percocet just 11 days earlier. (Tr. 517)
- 9/17/09 – Plaintiff reported to his treating physician that he had an appointment with a pain management specialist, but he requested a refill on his Percocet to last for one week until his appointment. The treatment notes indicate that plaintiff had gone to the emergency room four days earlier and had been given 20 Percocet tablets. At the time, plaintiff admitted he was taking 1 ½ pills to obtain relief, which exceeded the amount he had been prescribed. (Tr. 361)
- 11/06/09 – Plaintiff presented to the emergency room and requested injections of a muscle relaxer. (Tr. 514)
- 6/10 – Plaintiff called his primary care physician and requested a prescription for cough medicine with codeine. (Tr. 604)
- 9/10 – Plaintiff admitted he had taken "old Vicodin." (Tr. 620)

(Tr. 23-24).

The ALJ also relied on evidence that on November 26, 2009, the emergency room physicians determined that plaintiff needed to be placed on a "care plan" after plaintiff presented to the emergency room with complaints of low back pain. (Tr. 510-11). In the emergency

7

room report, the attending physician, Dr. Thomas Cruz, M.D., stated: "Due to this patient's frequent visits, since he has been here almost twice a month all year with multiple visits last year as well, most of these visits this year have been for this back pain minus 2 of them, which were for bronchitis. Due to that and after viewing his OARRS (Ohio Automated Rx Reporting System) report, although he is consistently getting his pain medications from either Dr. Nori [Dr. Mahboob Noory, M.D.], his primary care physician or Dr. Khan [Dr. Mukarram Khan, D.O., plaintiff's treating pain specialist], I think he is getting a significant amount of pain medications. At this point, we feel he needs to be placed on a care plan here in the emergency department." (Tr. 511). The ALJ noted that on January 8, 2010, after plaintiff again presented at the emergency room requesting pain medication, the attending physician, Dr. Michael Argus, M.D., discussed the care plan with him that had originated in late November, under which doctors could not prescribe narcotics for plaintiff in the emergency room but were to refer him to an orthopedist or a specialist for his back pain. (Tr. 506-507). The ALJ noted that according to the attending physician, the care plan had originated in late November 2009 in response to information that plaintiff had received over the course of 60 days from five different providers 110 Oxycontin, 90 Valium, and 270 Klonopin. (*Id.*). The attending physician reported that plaintiff seemed understanding but nonetheless asked for some pain medication as Percocet did "not help much." (Tr. 507).

Plaintiff contends that the ALJ was not entitled to rely on the assessment of the emergency room physicians because attending physician Dr. Cruz inaccurately described plaintiff's emergency room visits of July 7, 2009, August 14, 2009, August 17, 2009, September

8

13, 2009, September 28, 2009, November 6, 2009 (which was unrelated to back pain), December 26, 2009, and January 8, 2010.   Plaintiff contends that he had not been to the emergency room for several months prior to Dr. Cruz's November 2009 report.   (Doc. 11 at 14, citing Tr. 494-527).   Plaintiff further disputes that the amount of medication he took (110 Oxycodone, 90 Valium and 270 Klonopin over a 60-day period) is indicative of prescription drug abuse.

Despite plaintiff's alternative explanations of the medical evidence, the record nevertheless shows that plaintiff had made numerous visits to the emergency room; he made several requests for narcotic pain medication; and he sometimes took more than the amount of narcotic pain medication prescribed for him.   The ALJ's finding that plaintiff was likely abusing prescription drugs based on the assessments of the emergency room physicians concerning the need to restrict plaintiff's access to narcotic pain medication and the chronology of medical treatment set forth above was not unreasonable.

Plaintiff further contends that the ALJ's reliance on the emergency room's institution of a care plan to find "probable prescription drug abuse" was in error because several medical sources explicitly found no evidence of drug use or abuse.   Plaintiff notes that his treating psychologist, Dr. Margaret Conradi, Ed.D., completed questionnaires in May 2010 and October 2010 stating that "chemical dependency" had not been a factor in her treatment of plaintiff (Tr. 591, 612); plaintiff's treating pain physician Dr. Mukarram Khan, D.O., reported in September and October 2010 that he did not see objective signs of drug overdose or withdrawal such as dilated pupils or track marks (Tr. 618-19, 620, 622-23); state agency reviewing psychologist Dr. Bruce Goldsmith, Ph.D., noted "no drug and alcohol [history]" in his March 29, 2010 reconsideration report (Tr.

530); and consulting psychologist Dr. Buban did not report any drug or alcohol history.   (Tr.

71-77).   (Doc. 11 at 14; Doc. 16 at 4).   However, observations by plaintiff's treating providers

that they did not see signs of drug overdose or withdrawal, of "chemical dependency," or of

intravenous drug use are not necessarily inconsistent with prescription narcotic pain medication

abuse.   Nor was the ALJ required to disregard the emergency room physicians' concern

regarding plaintiff's potential abuse of narcotic pain medication simply because the reviewing

medical sources failed to note a drug history.   (Tr. 530).

        The ALJ undertook a thorough review of plaintiff's frequent emergency room visits and

his numerous requests for pain medication from both his primary care physician and emergency

room physicians.   Plaintiff's medical history, together with the decision of the emergency room

department to place plaintiff on a "care plan" that would restrict plaintiff's access to narcotic pain

medication, constitute substantial evidence to support the ALJ's finding that plaintiff exhibited

drug seeking behavior and that it was "probable" he abused prescription drugs.   *See Richardson*,

402 U.S. at 401 ("substantial evidence" is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.").

        Plaintiff correctly argues, and the Commissioner concedes, that there is no evidence to

show that plaintiff's possible abuse of prescription drugs significantly limited his physical or

mental ability to perform basic work activities so as to constitute a severe impairment.   *See* 20

C.F.R. §§ 404.1520(c), 416.920(c).   However, any error the ALJ committed in this regard is

harmless as the ALJ did not impose any functional limitations resulting from prescription drug

abuse.   Instead, the ALJ properly considered the evidence of plaintiff's possible prescription

drug abuse only insofar as it impacted plaintiff's credibility, and specifically plaintiff's complaints of disabling back pain. The ALJ reasonably determined that such behavior may have negatively impacted plaintiff's credibility insofar as plaintiff possibly complained of pain to his medical providers in order to obtain narcotic pain medication. (Tr. 23). Moreover, the ALJ's decision sets forth additional reasons that provide a reasonable basis for discounting plaintiff's complaints of pain and other symptoms, even apart from plaintiff's possible prescription drug abuse.

First, the ALJ reasonably determined that plaintiff's allegations concerning the severity of his impairments and associated pain were not consistent with the objective medical evidence. The ALJ relied on a lack of positive findings on lung studies (Tr. 23, citing Tr. 493, 512, 573, 595) and an increase in total lung capacity and residual volume in November 2010 as compared to November 2008. (Tr. 23, citing Tr. 649). The ALJ also cited evidence that plaintiff's treatment for his back pain had been routine or conservative in nature and had generally been successful in controlling plaintiff's symptoms. (Tr. 23). The ALJ acknowledged that in October 2009, plaintiff's treating pain management specialist, Dr. Khan, ordered up to three lumbar epidural steroid injections and recommended that plaintiff seek a surgical consultation if these were not successful. (Tr. 23, 413). Plaintiff initially reported a 70% improvement in his back pain after receiving injections in October and November 2009. (Tr. 408, 411). Dr. Khan then fitted plaintiff with a TENS unit in December 2009 and told him to follow up with him in one month. (Tr. 406-07). Plaintiff later reported that the TENS unit was effective (Tr. 620,

11

622), and there is no evidence that Dr.Khan actually referred plaintiff for a surgical consult or that any treating provider believed surgery was necessary to treat plaintiff's back pain.

Second, the ALJ reasonably found plaintiff's testimony concerning his activities of daily living were inconsistent with statements he made to his treating providers and in his written prehearing statements. (Tr. 25). While plaintiff testified that he experiences constant back pain that prevents him from sitting or standing for long periods, his reports to his medical providers and to the Social Security Administration indicate a greater functional ability. In October 2008, plaintiff admitted to his treating physician that he was remodeling his bathroom (Tr. 373 - plaintiff reported he strained his shoulder while remodeling his bathroom); in July 2009, he reported at the emergency room that he injured his arm while pulling things off his truck (Tr. 345); in June 2010 he reported to a treating medical provider that he was able to ride a bicycle (Tr. 607); in August 2010 he reported that he had been outside working in his garden and was doing lifting (Tr. 596); and he reported to a treating counselor in August 2010 that he exercised four days a week at a level that he described as being of medium intensity. (Tr. 629). Additionally, in prehearing statements to the SSA in November 2009, plaintiff estimated that he spent two hours mowing the yard every four days, acknowledged that he is able to drive a vehicle and travel independently, and stated he went outside his home at least every other day. (Tr. 227). Plaintiff further admitted he was able to go shopping every two weeks for two hours at a time. (*Id.*). Also, despite plaintiff's testimony that he was limited to cooking with breaks and loading the dishwasher and that he used a cane every time he went out (Tr. 92, 94), during a prior initial evaluation at Deerfield Township Family Counseling Center on August 19, 2010, plaintiff

12

reported no limitations in activities of daily living including cooking, homemaking, shopping, mobility, transportation, time management, or child care.  (Tr. 630).  *See Heston v. Comm'r*, 245 F.3d 528, 536 (6th Cir. 2001) (In determining credibility, the ALJ may consider the claimant's testimony of limitations in light of other evidence of the claimant's ability to perform other tasks such as walking, going to church, going on vacation, cooking, vacuuming and making beds).

Third, the ALJ found plaintiff's allegations that he cannot be around the public because of the risk of exposure to sickness, that he is unable to get along with others, and that he is unable to concentrate were not entirely consistent with the record evidence of his social activities. Although traveling and disability are not necessarily mutually exclusive, plaintiff's decision to travel to Washington, D.C. in April 2008 (Tr. 379) and his plan to travel there in April 2010 to lobby Congress (Tr. 578) suggested that plaintiff placed himself in public situations where he would encounter members of the public.  (Tr. 26).  Plaintiff also reported he got along with others (Tr. 390), attended township trustee meetings twice a month, and was an effective participant at these meetings (Tr. 228, 581, 636).

Thus, although the ALJ erred by including "probable prescription drug abuse" among plaintiff's severe impairments, the error was harmless as the ALJ was entitled to discount plaintiff's complaints of pain based on plaintiff's probable prescription drug abuse and the additional evidence outlined above, which the ALJ reasonably determined further undermined plaintiff's credibility.  The Court must defer to the ALJ's credibility determination as supported by substantial evidence.  *See Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001) (In light of the

13

ALJ's opportunity to observe the individual's demeanor at the hearing, the ALJ's credibility finding is entitled to deference and should not be discarded lightly).

Plaintiff contends that the ALJ committed an additional error in connection with the finding of "probable prescription drug abuse" by placing the burden on plaintiff to produce an Ohio Automated Rx Reporting System (OARRS) report, refusing to issue a subpoena requested by plaintiff's counsel to assist him in obtaining the report, and declining to explain to plaintiff alternative methods for obtaining the report. (Doc. 11 at 15-16). At the administrative hearing, the ALJ questioned plaintiff about the care plan and whether he had ever obtained medication from several different sources at the same time. (Tr. 69). Plaintiff denied that he ever done so, testified that no one had ever discussed the care plan with him, and stated that he was aware that the only source from whom he could obtain pain medication was Dr. Khan. (Tr. 69-70). At the conclusion of the hearing, the ALJ stated that the emergency department had reviewed the OARRS report due to plaintiff's multiple visits to the emergency room and had put plaintiff on a care plan, which suggested a history of prescription drug abuse, and that during this same time period plaintiff was obtaining the same medication from three physicians. (Tr. 98-99). The ALJ allowed plaintiff two weeks following the administrative hearing to obtain the OARRS report to rule out any question of prescription drug abuse.[1] (Tr. 99). The ALJ stated if nothing was submitted, she would decide the issue based on the existing record. (Tr. 101). Plaintiff's counsel filed a Request for a Subpoena with the ALJ eight days later on December 28, 2010, stating the OARRS report could be obtained only by an individual with an account with the Ohio

---

[1] The ALJ stated in her decision that the OARRS report would have "detailed the prescriptions filled by the claimant and the identity of the prescribing physicians in order for him to clear up any issue regarding this drug seeking issue

14

State Board of Pharmacy or upon issuance of a subpoena if the records are needed for any legal issue. (Tr. 25, citing Tr. 331-32). The ALJ denied the request in her hearing decision, finding that plaintiff's counsel could have obtained the report from plaintiff's treating physician or from any other provider who has an account with the Board, and counsel had therefore failed to show that a subpoena was necessary to obtain the report. (Tr. 25). The ALJ found based on plaintiff's failure to submit a copy of the report, which plaintiff alleged would refute treatment records indicating he had received prescriptions from a total of five different providers over a two-month period, that there was no evidence to contradict the emergency room physicians' accounts of plaintiff's drug seeking behavior. (*Id.*, citing Tr. 506, 511). The ALJ also noted that the treatment records and the emergency room physician's description of plaintiff's OARRS report directly contradicted plaintiff's testimony that he received narcotic pain medication only from his treating pain management specialist.

Plaintiff contends that by refusing to assist him with obtaining the OARRS report after placing the burden on him to obtain the report, the ALJ violated her duty to investigate the circumstances of plaintiff's situation and facilitate the development of the evidentiary record. (Doc. 11 at 16, citing *Lukaszewicz v. Astrue*, No. 10-1185, 2011 WL 2441732, at *8 (W.D. Pa. May 27, 2011) (citing *Sims v. Apfel*, 530 U.S. 103, 111 (2000); *Reefer v. Barnhart*, 326 F.3d 376, 380-81 (3rd Cir. 2003)). The Commissioner contends that it was plaintiff's burden to address concerns regarding his prescription drug use that were apparent from the record prior to the ALJ hearing and to make a proper request for a subpoena after the ALJ gave him an opportunity to do

---

raised by the record. . . ." (Tr. 24, citing Tr. 494-527 (emergency room records)).

so. (Doc. 15 at 13-14). The Commissioner contends that the ALJ was not obligated to grant plaintiff's request for a subpoena to obtain a copy of the report following the hearing, and the request did not comply with the Social Security Administration's procedural requirements. (*Id.* at 14, citing the Social Security Administration Hearing, Appeals and Litigation Law Manual (HALLEX) 1-2-5-78.B[2] - claimant must make written request explaining what evidence is expected to prove and showing that facts cannot be proven without a subpoena). The Commissioner further argues that the OARRS report was not required in order for the ALJ to make a decision in this matter. (*Id.*, citing HALLEX 1-2-5-78.C - ALJ should determine if issuance of subpoena is necessary for full presentation of case).

Although the claimant bears the ultimate burden of establishing that he is entitled to disability benefits, the ALJ has an affirmative duty to develop the factual record upon which his decision rests. *Vaca v. Comm'r of Soc. Sec*, 1:08-CV-653, 2010 WL 821656, at *5 (W.D. Mich. Mar. 4, 2010) (citing *Osburn v. Apfel,* No. 98-1784, 1999 WL 503528, at *7 (6th Cir. July 9, 1999) (quoting *Richardson,* 402 U.S. at 411) ("the responsibility for ensuring that every claimant receives a full and fair hearing lies with the administrative law judge"); *Echevarria v. Sec'y of Health and Human Services,* 685 F.2d 751, 755 (2nd Cir. 1982) (given the non-adversarial nature of a benefits proceeding, the ALJ "must himself affirmatively develop the record"). *See also Sims,* 530 U.S. at 110-11 (while the claimant bears the ultimate burden of establishing that he is entitled to disability benefits, courts have recognized that social security proceedings are "inquisitorial rather than adversarial.").

---

[2] The HALLEX is a procedural manual utilized by the Commissioner "that sets forth safeguards and procedures for these administrative proceedings." *Robinson v. Barnhart*, 124 F. App'x 405, 410 (6th Cir. 2005). The HALLEX is

The ALJ's actions in connection with the denial of the subpoena request strike the Court as unfair, regardless of whether the ALJ was obligated under the Social Security regulations to issue the subpoena. The ALJ allowed plaintiff two weeks to obtain the OARRS report to address concerns the ALJ stated on the record; denied plaintiff's request for a subpoena to obtain the report because plaintiff failed to show that he could not obtain the report through some other source, such as a treating provider or a pharmacist; and then drew an adverse inference based on plaintiff's failure to submit a copy of the report for which the ALJ denied the subpoena. The ALJ was fully aware of the reason for the request, and the time frame for plaintiff to obtain the needed records was short. There is no indication in the record that the ALJ communicated denial of the request to plaintiff within the two-week period allotted for plaintiff to obtain the report, or even prior to issuance of the ALJ's decision, so as to allow plaintiff an opportunity to seek to obtain the OARRS report through an alternative source.

Nonetheless, plaintiff has not shown that he has been prejudiced in any manner by the ALJ's actions. Plaintiff does not allege that he made any effort to obtain the OARRS report following issuance of the ALJ's decision and, if so, why his efforts were unsuccessful. Nor does plaintiff make any specific allegations as to what the OARRS report would have shown. Specifically, plaintiff does not allege that Dr. Cruz's description of the contents of the OARRS report was in error. Thus, plaintiff has not shown that the ALJ would have reached a different conclusion had the OARRS report been made available to her. Based on the record before the Court, there is nothing to show that the ALJ erred by determining based on the chronology of

available at http://search.usa.gov/search?query=hallex&affiliate=ssa&btnG=GO.

plaintiff's medication requests, the emergency room physicians' reports (including consideration of the OARRS report), and the emergency room physicians' decision to place plaintiff on a care plan that plaintiff had likely abused prescription drugs. For these reasons, plaintiff's first assignment of error should be overruled.

## 2. The ALJ's weighing of the medical opinions of record.

Plaintiff alleges that the ALJ erred by improperly weighing the medical opinion evidence and by failing to give the appropriate weight to the opinions of his treating providers, Dr. Margaret Conradi, Ed.D., and Dr. Junaid S.A. Malik, M.D.

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Kinsella v. Schweiker,* 708 F.2d 1058, 1060 (6th Cir. 1983). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Blakley*, 581 F.3d at 406; *Wilson*, 378 F.3d at 544. "The treating physician doctrine is based on the

18

assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

The treating physician rule mandates that the ALJ "will" give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (citing former 20 C.F.R. § 404.1527(d)(2)).[1]  If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. §§ 404.1527(c)(2)-(6) and 416.927(c)(2)-(6) in determining what weight to give the opinion. *Wilson*, 378 F.3d at 544. "Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citing former 20 C.F.R. §404.1527(d)(2)).  Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (citing SSR 96-2p).

Medical expert testimony consistent with the evidence of record can constitute substantial evidence to support the Commissioner's decision. *See Barker*, 40 F.3d at 794-95; *Atterberry v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 570 (6th Cir. 1989).  "A non-examining

---

[1]Title 20 C.F.R. §§ 404.1527 and 416.927 were amended effective March 26, 2012.  The provisions governing the weight to be afforded a medical opinion were previously found at §§ 404.1527(d) and 416.927(d).

physician's opinion may be accepted over that of an examining physician when the

non-examining physician clearly states the reasons that his opinions differ from those of the

examining physicians." *Lyons v. Social Security Admin.*, 19 F. App'x 294, 302 (6th Cir. 2001)

(citing *Barker*, 40 F.3d at 794) (ALJ was entitled to accept non-examining medical advisor's

opinion as to the severity of the plaintiff's impairments where, to the extent the medical advisor's

conclusions differed from those of the examining psychologist, the medical advisor explained his

position by reference to the objective medical and psychological reports in the plaintiff's file, as

well as the undisputed facts concerning the plaintiff's prior work and social history).

### i.  Mental impairments

First, plaintiff contends that the ALJ erred by giving Dr. Conradi's opinions "little

weight."  (Doc. 11 at 17, citing Tr. 28-29).  Plaintiff contends that the reasons the ALJ cited are

not sufficient to discount Dr. Conradi's opinion.  (*Id.* at 17-18).  Plaintiff argues that the ALJ

misconstrued the record, improperly disregarded opinions Dr. Conradi gave based on the impact

of plaintiff's physical condition given that Dr. Conradi diagnosed mood disturbance due to

plaintiff's medical condition, and incorrectly determined that Dr. Conradi's opinions were based

largely on plaintiff's subjective complaints when in fact this was true only of Dr. Conradi's

opinions regarding plaintiff's physical complaints.

The ALJ gave "little" weight to four reports of Dr. Conradi dated December 2009 (Tr.

386-88), March 2010 (Tr. 415-16), May 2010 (Tr. 579, 582) and October 2010 (Tr. 610).  (Tr.

29).  The ALJ discounted Dr. Conradi's reports because the ALJ found they were not supported

by the objective medical evidence, the credible reports of plaintiff's activities of daily living, or

20

her treatment notes. (Tr. 28). The ALJ noted that in the May 2010 report, Dr. Conradi opined that plaintiff had mild to moderate limitations in his ability to make occupational adjustments and understand and carry out complex job instructions, he had marked to extreme limitations in his ability to behave in an emotionally stable manner, and he was incapable of working for any number of hours per workday. (Tr. 29-30, citing Tr. 589-90). In October 2010, Dr. Conradi opined that plaintiff had marked limitations in his ability to relate predictably in social situations and deal with work stresses and moderate limitations in his ability to deal with the public and behave in an emotionally stable manner. (*Id.*, citing Tr. 610, 611). The ALJ noted that Dr. Conradi also opined that plaintiff alienated family and friends and isolated when depressed. (*Id.*). The ALJ found these conclusions were inconsistent with Dr. Conradi's treatment records noting that plaintiff was very social and involved in the community; with evidence that plaintiff was a respected member of his community who interacted regularly with his family; and with "the credible reports of [plaintiff's] activities of daily living," including his lobbying efforts. (*Id.*). The ALJ also found Dr. Conradi's opinion that plaintiff had low self-esteem to be unsupported by her treatment notes, which indicated that plaintiff saw himself as respected and looked up to by the community. (*Id.*, citing 607). The ALJ gave little weight to Dr. Conradi's March 2010 assessment that plaintiff could not lift, twist, climb ladders, push a vacuum or move more than 20 minutes; he was incapable of working for any number of hours per workday; and he would miss 20 or more days of work per month due to his impairments. (Tr. 29, citing 579). The ALJ found that Dr. Conradi provided very little explanation of the evidence upon which she relied in forming her opinion and it was therefore quite conclusory. (*Id.*). Finally, the ALJ

21

addressed Dr. Conradi's October 2010 supplemental response to a letter the ALJ had submitted to her seeking clarification as to the basis for her opinions. (*Id.*, citing Tr. 592-93). The ALJ found that Dr. Conradi had relied on plaintiff's subjective complaints of his physical complaints as reported to her, and there was no evidence Dr. Conradi had reviewed plaintiff's physical treatment records. (*Id.*). The ALJ declined to give any weight to Dr. Conradi's conclusions regarding any physical limitations because the ALJ found such opinions were outside Dr. Conradi's area of expertise. (*Id.*, citing Tr. 592-93).

The ALJ gave "good reasons" for declining to give controlling weight to the opinion of Dr. Conradi and for instead giving her opinions only "little" weight. *See Cole*, 661 F.3d at 937. The ALJ adequately explained her reasons for discounting Dr. Conradi's opinions and there is substantial evidence in the record to support her reasons.

First, the ALJ reasonably determined that the marked limitations in social functioning found by Dr. Conradi were inconsistent with plaintiff's reports of his daily activities, including his biweekly attendance at community township meetings and the outings he went on every other day, as well as plaintiff's reports that he "gets along with people" and "is very social." (Tr. 29, 281, 390, 581, 607, 636).

Second, the ALJ reasonably determined that Dr. Conradi's treatment notes did not support her findings. While Dr. Conradi opined that plaintiff could not focus or maintain concentration, had a low tolerance for criticism, and was easily frustrated (Tr. 387), Dr. Conradi's notes reflect that during the course of her treatment plaintiff regularly attended and participated in community trustee meetings, wrote to Congress to lobby for medical research, and

22

traveled to Washington, D.C. (Tr. 379, 581, 607, 608, 636). Moreover, while Dr. Conradi opined in December 2009 that plaintiff "cannot focus and maintain concentration," in May 2010 plaintiff had only "moderate" limitations in his ability to maintain attention and concentration and by October 2010 Dr. Conradi rated these limitations as only "mild." (Tr. 387, 589, 610). Dr. Conradi's conclusion that plaintiff had marked to extreme limitations in his ability to behave in an emotionally stable manner was inconsistent with Dr. Conradi's notes that plaintiff is very social and involved in the community and he saw himself as respected and looked up to by the community, and was also inconsistent with the credible reports of his daily activities. (*Id.*). Plaintiff asserts that the ALJ mischaracterized the record because he traveled to Washington, D.C. on only one occasion, but not for lobbying purposes, and he wrote only one letter to Congress instead of "letters." (Doc. 11, citing Tr. 18). However, the purpose of plaintiff's trip and whether he wrote one or more letters to Congress are not material discrepancies. Plaintiff also posits reasons why he felt more at ease socially at the township meetings than in other settings to show there is no inconsistency between his attendance at these meetings and Dr. Conradi's findings of marked mental limitations. (Doc. 11 at 18, citing Tr. 415, 416, 579, 608). However, the explanations offered by plaintiff as to why he is better able to function in certain social settings are not based on the medical evidence of record.

Plaintiff also contends the reason Dr. Conradi opined that he has marked limitations in interacting with the public is because he is "emotionally unpredictable," "explodes when angered," "presses into issues when he 'knows' he is right," and "[t]alks excessively at community meetings." (*Id.* at 19, citing Tr. 387, 582). As plaintiff notes, Dr. Conradi in

23

December 2009 identified these traits as significant problems with social interaction, especially as it would relate to the general public or coworkers or supervisors.  (Tr. 387, 582).  However, in May 2010, Dr. Conradi reported that plaintiff had only "mild" limitations in relating to coworkers or supervisors and only a moderate limitation in dealing with the public.  (Tr. 589). By October 2010, Dr. Conradi opined that plaintiff had no limitation in relating to coworkers, only a "mild" limitation in relating to supervisors, and a moderate limitation in dealing with the public.  (Tr. 590).  The ALJ reasonably discounted Dr. Conradi's opinion given the inconsistencies in Dr. Conradi's assessments of plaintiff's social functioning.  The ALJ could reasonably conclude based on plaintiff's activities that Dr. Conradi's treatment notes did not support the marked limitations in mental functioning she found.

Third, the ALJ reasonably discounted Dr. Conradi's opinion that plaintiff was incapable of working for any number of hours in a workday and would miss more than 20 days of work per month due to his impairments.  The ALJ found that Dr. Conradi provided little explanation of the evidence upon which she relied in forming her opinion (Tr. 29), which plaintiff does not dispute.  In addition, the ALJ stated that Dr. Conradi's conclusions regarding any physical limitations were outside the doctor's area of expertise and her assessment of those limitations was based largely on plaintiff's subjective complaints.  Plaintiff acknowledges that Dr. Conradi's opinions on limitations from physical impairments are entitled to little weight but argues that Dr. Conradi could properly comment on how plaintiff's ability to cope with various physical impairments affects his ability to work because she diagnosed mood disorder due to medical condition.  (Doc. 11 at 19, citing Tr. 593).  Plaintiff further alleges that Dr. Conradi's

opinions about physical and psychological impairments can be separated and that not all of Dr.

Conradi's statements include opinions regarding the effects of his physical impairments.

However, it appears that Dr. Conradi went beyond her area of expertise and factored plaintiff's

self-reported physical impairments and limitations into her opinions of the degree of plaintiff's

mental limitations.

Specifically, Dr. Conradi appears to have relied heavily on plaintiff's physical

impairments in her March 2010 assessment of plaintiff's mental functioning. (Tr. 579-80). In

describing plaintiff's "significant clinical mental status abnormalities," Dr. Conradi reported that

plaintiff had "very low self esteem - thinks of self as unmanly due to limitations. . . ." (Tr. 579).

Dr. Conradi listed only physical limitations in describing how plaintiff's daily activities were

significantly restricted, stating plaintiff "can't lift, can't twist, can't climb ladders - hard to get up

& walk (stiff) . . . Can't push vacuum. Back locks up after 20 minutes of movement. Walks

with cane." (Id.). When asked to describe the effect of "the impairment" on plaintiff's

interests, habits and self-care, Dr. Conradi responded that plaintiff felt "useless" and "unmanly,"

he was embarrassed by his cane, he was unable to participate in sports and recreational activities,

and he was frustrated by his medical issues. (Id.). Dr. Conradi also opined that plaintiff could

not be around too many people because his prescribed narcotics "knock him out" and he fears

interactions partly because he is prone to infections. (Id.). She indicated that his inability to

function as he previously did was a trigger for decompensating and that his symptoms had

accelerated in September 2009 when his back "gave out." (Tr. 579-80). Dr. Conradi also

indicated that his only help for his physical problems was medication to relieve the pain. (Tr.

25

580). Dr. Conradi reported that plaintiff had "no stress tolerance" because medications did not help and his inability to work was a constant stress. (*Id.*).

Similarly, in her May 2010 assessment of plaintiff's mental ability to do work-related activities, Dr. Conradi supported many of her conclusions on the degree of plaintiff's mental limitations with findings pertaining to his physical impairments. (Tr. 589-90). In support of her finding that plaintiff had mild to moderate limitations in dealing with others and with work stress and in maintaining attention and concentration, Dr. Conradi stated that plaintiff admitted to difficulty controlling his temper and mood shifts, "exacerbated by multiple medical conditions." (Tr. 589). She opined that these factors impacted plaintiff's personal relationships and did not allow for stress. (*Id.*). She opined that plaintiff had mild to moderate limitations in his ability to understand and carry out complex job instructions because he is "often distracted by emotions, and physical issues cause loss of focus as well." (Tr. 590). In support of her finding that plaintiff had moderate and marked to extreme limitations in his ability to make personal and social adjustments, Dr. Conradi stated that plaintiff's "medical problems and personality factors cause him to be unreliable and his behavior to be unpredictable. His anger is manifested severely." (*Id.*). Finally, Dr. Conradi opined that plaintiff had low self-esteem "due to inability to be employed," that he was "agoraphobic due in part to fear of infection from contact," and that he was "[f]rustrated with medical conditions and inability to 'fix.'" (*Id.*).

When the ALJ sought additional clarification regarding Dr. Conradi's assessment of plaintiff's functional limitations in October 2010 (Tr. 289), Dr. Conradi responded that plaintiff had reported his physical impairments to her, stating that he had been partially disabled by a

sports injury in 2005, his back "gave out" in September 2009, and he had long-term emphysema

(Tr. 593).   (Tr. 29).   Yet, plaintiff has pointed to no evidence that Dr. Conradi ever reviewed

plaintiff's treatment records pertaining to those impairments.   Dr. Conradi therefore appears to

have relied quite heavily on plaintiff's self-reported symptoms, which the ALJ reasonably found

to be of questionable reliability.   The ALJ was justified in finding that Dr. Conradi, as a

psychologist, was not qualified to base her findings on evidence of plaintiff's physical

impairments and in giving reduced weight to Dr. Conradi's opinions on this basis.   *See* 20

C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) ("We generally give more weight to the opinion of a

specialist about medical issues related to his or her area of specialty than to the opinion of a

source who is not a specialist.").

Finally, the ALJ was entitled to rely on the opinions of the evaluating consultative

psychologist, Dale Seifert, M.S.Ed. (Tr. 389-93), the state agency reviewing psychologist, Dr.

Catherine Flynn, Psy.D. (Tr. 532-43), and the testifying medical expert, Dr. Buban (Tr. 71-77), to

discount the opinions of Dr. Conradi.   *See* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2).   *See*

*Barker*, 40 F.3d at 794-95; *Atterberry*, 871 F.2d at 570.   These sources consistently assessed

plaintiff as having only mild to moderate limitations.   Dr. Seifert opined in December 2009 that

plaintiff had mild limitations in the ability to relate to others, including fellow workers and

supervisors; mild limitations in the ability to understand and follow instructions; mild limitations

in the ability to maintain attention to perform simple/repetitive tasks; and moderate limitation in

his ability to withstand the stress and pressures of daily work.   (Tr. 393).   He assessed a GAF[3]

---

[3] A GAF score represents "the clinician's judgment of the individual's overall level of functioning."
American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev.

score of 65. (*Id.*). In January 2010, state agency psychologist, Catherine Flynn, Psy.D.,

reviewed the record and opined that plaintiff had mild restrictions in his activities of daily living,

moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining

concentration, persistence or pace. (Tr. 543). Dr. Flynn further opined that plaintiff was

moderately limited in his ability to complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without

an unreasonable number and length of rest periods, to interact appropriately with the general

public, and to accept instructions and respond appropriately to criticism from supervisors. (Tr.

548). Dr. Buban testified that based on her review "over the length of the record," she did not

find that plaintiff had significant difficulty in getting along with others and she would limit

plaintiff to occasional contact with supervisors and co-workers, limit him to no contact with the

public, and restrict his productions quotas and strict time standards in order to account for

moderate limitations on concentration. (Tr. 74-75).

Plaintiff contends that the fact that the opinions of the reviewing psychologists differed

from the assessments of Dr. Conradi is "not dispositive of the issue of how much weight to

afford Dr. Conradi's opinion." (Doc. 16 at 9). However, as shown above, the ALJ did not rely

solely on the contrary findings of the state agency psychologists to discount Dr. Conradi's

opinions. Moreover, plaintiff does not dispute that Dr. Buban was able to review Dr. Conradi's

progress notes before issuing her assessment at the ALJ hearing in December 2010. Finally,

---

2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social,
and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger
of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act
with clear expectation of death). *Id.* at 34. A GAF score of 61 to 70 refers to an individual with "some mild"

plaintiff appears to contend that the ALJ's reliance on Dr. Buban's opinion to discount Dr.

Conradi's opinion was misplaced because Dr. Buban apparently agreed with Dr. Conradi that

plaintiff's mental functioning had declined over time. (Doc. 16 at 9-10, citing Tr. 75-76).

However, Dr. Buban clearly testified that although the more recent clinical records indicated a

"very low frustration tolerance" and a "lot of . . . familial and psycho-social" stress, there was

nothing in the record that substantiated a marked or extreme limitation in mental functioning as

opposed to the moderate limitation imposed by the state agency reviewing psychologist. (Tr.

75).

For these reasons, the ALJ did not err in weighing the medical opinions of record

pertaining to plaintiff's mental impairments and by finding the opinions of plaintiff's treating

psychologist, Dr. Conradi, were entitled to "little" weight.

### ii. Physical impairments

Plaintiff also alleges as error that the ALJ failed to give "controlling" or at least

"significant" weight to the December 8, 2010 opinion of plaintiff's treating pulmonologist, Dr.

Malik. (Doc. 11 at 21). Plaintiff contends that the ALJ's rejection of Dr. Malik's opinion fails

to reflect an understanding of his disease; plaintiff's activities of daily living are not inconsistent

with Dr. Malik's recommendations; and the ALJ erroneously described the treatment period as

brief given that the record appears to show that plaintiff treated with Dr. Malik from May 2006

through December 2010. (Doc. 11 at 22, citing Tr. 337-41, 453-86, 551-76, 613-16, 651).

---

symptoms who is "generally functioning pretty well." *Id. See* DSM-IV at 32.

Dr. Malik indicated in a treatment note dated November 9, 2010, that from a "lung point of view," it might be difficult for plaintiff to stay at a job because of the risk of infections. (Tr. 614). Dr. Malik wrote a letter dated December 8, 2010, that reads in its entirety as follows:

> Unfortunately Mr. Holland has a diagnosis of Alpha 1 anti-trypsin deficiency and has been treated with replacement hormones now for some time. Unfortunately he's also had sleep apnea and because of recent infections every time he goes to the job place he returns with an infection. I had ordered an IgG level and it is on the low side for him and I'm considering replacement therapy for this also. However, avoidance of situations where sick individuals are at risk would be recommended.
>
> I would strongly suggest if there is a possibility of doing a job at home that would be a much better situation for him and I would ask that you consider this.

(Tr. 651).

The ALJ gave "good reasons" for declining to give controlling weight to the opinion of Dr. Malik and for instead giving his opinion only "little" weight. *See Cole*, 661 F.3d at 937. The ALJ adequately explained her reasons for discounting Dr. Malik's opinions and cited evidence in the record to support her reasons. Although the Commissioner concedes that the ALJ erred in finding that plaintiff's treating relationship with Dr. Malik was "quite brief" (Doc. 15 at 6, n.3), this error was harmless as substantial evidence supports the ALJ's decision in all other respects. First, the ALJ reasonably determined that Dr. Malik failed to set forth findings of significant clinical and laboratory abnormalities that would support the conclusion that plaintiff was required to stay at home. Plaintiff points to laboratory findings that confirm his diagnosis of Alpha-I antitrypsin and Immunoglobulin G deficiencies and purportedly support Dr. Malik's opinion. (Tr. 338, 471, 616). However, Dr. Malik confirmed in his December 2010 letter only

30

that plaintiff has been diagnosed with Alpha-I antitrypsin deficiency and that Dr. Malik was

considering replacement therapy as plaintiff's "IgG level" was "on the low side for him."  (Tr.

651).   Dr. Malik did not cite any clinical or other objective findings to document the severity of

plaintiff's impairments and accompanying symptoms, but instead made an unsubstantiated and

somewhat perplexing assertion that "every time he goes to the job place he returns with an

infection."  (Tr. 651).   Thus, the ALJ was not required to accept Dr. Malik's recommendation

regarding workplace restrictions.  *See Cutlip v. Secretary of Health and Human Services,* 25

F.3d 284, 287 (6th Cir. 1994) (ALJ is not required to credit medical source's conclusions

regarding a claimant's functional capacity where those conclusions are not substantiated by

objective evidence); *accord Blacha v. Secretary of Health and Human Services,* 927 F.2d 228,

230-31 (6th Cir. 1990) (affirming finding of non-disability despite herniated disc and

degenerative arthritis in the spine).  *See also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390

(6th Cir. 2004) (although "[g]enerally the opinions of treating physicians are given substantial, if

not controlling, deference," they are only given such deference when the opinions are supported

by objective medical evidence.).   Moreover, although the ALJ was obligated to consider the

opinion of Dr. Malik, ultimately the determination of a claimant's RFC is "reserved to the

Commissioner" 20 C.F.R. §§ 404.1527(d), §416.927(d), and the ALJ was not bound by Dr.

Malik's recommendation that plaintiff should work at home if at all possible.   (Tr. 651).

Second, the ALJ reasonably determined that Dr. Malik's conclusion that plaintiff might

have difficulty working because of the increased risk of infection posed by interacting with the

public was belied by evidence showing that plaintiff regularly and voluntarily goes out into

31

public without exacerbating his condition. (Tr. 27). In finding Dr. Malik's conclusion to be unsubstantiated, the ALJ justifiably relied on plaintiff's own prehearing statements that he went to township trustee meetings twice a month, he got out of the house every other day, and he went grocery shopping twice a month. (Tr. 26, 27).

Third, the ALJ reasonably found plaintiff's activities of daily living, which included frequent public outings, to be inconsistent with Dr. Malik's recommendation that plaintiff should avoid contact with sick people. (Tr. 27). Accordingly, the ALJ was not required to find based on Dr. Malik's opinion that plaintiff was unable to work outside the home.

For these reasons, the ALJ did not err in weighing the medical opinions of record and by finding the opinion of plaintiff's treating pulmonologist, Dr. Malik, was entitled to "little" weight. Plaintiff's second assignment of error should be overruled.

**3. The ALJ's alleged selective choosing of evidence from the record to support her conclusions.**

Plaintiff alleges as his third assignment of error that the ALJ erred by considering the record as a whole and selectively choosing only that evidence that supported a finding of non-disability. (Doc. 11 at 23). Plaintiff's third assignment of error is actually a catch-all for a number of different errors he alleges the ALJ committed. First, plaintiff contends that the ALJ found inconsistencies in the record that did not actually exist. (*Id.*). Plaintiff asserts that the ALJ improperly focused a great deal on the fact that he attended trustee meetings in the town of Goshen (Tr. 29), which plaintiff suggests was unreasonable because the meetings occurred only twice a month and plaintiff believed people at the meeting actually listened to him, which

32

allowed him to overcome his usual anxiety around others. (*Id.*, citing Tr. 228- 11/09 Adult Function Report). Plaintiff also asserts that the ALJ misconstrued the record by assuming he actually went to Washington, D.C. to lobby Congress in 2010, whereas the records show only that he considered making such a trip in 2010, and there is no evidence that a trip he made there in 2008 was for lobbying purposes. (*Id.*, citing Tr. 379, 578, 607). Second, plaintiff alleges that the ALJ improperly assumed he was abusing prescription pain medication based on the statements of the emergency room physicians. (*Id.* at 24-25). Plaintiff asserts this was error because neither physician actually diagnosed drug abuse or dependency and there is ample evidence of debility resulting from his back impairment (*Id.* at 25, citing evidence), shoulder and cervical spine impairments (*Id.* at 24-25), and breathing impairments (*Id.* at 25). Plaintiff further contends that his psychological impairments are well documented by objective medical findings. (*Id.* at 25). Plaintiff contends that the ALJ "overly emphasized a few statements taken out of context and ignored the large body of evidence which supports disability" so that a remand is required. (*Id.* at 26).

The ALJ is obligated to consider the record as a whole. *Hurst v. Secretary of Health and Human Services*, 753 F.2d 517, 519 (6th Cir. 1985). It is essential for meaningful appellate review that the ALJ articulate reasons for crediting or rejecting particular sources of evidence. *Morris v. Secretary of Health & Human Services*, No. 86-5875, 1988 WL 34109, at *2 (6th Cir. April 18, 1988). Otherwise, the reviewing court is unable to discern "if significant probative evidence was not credited or simply ignored." *Id.* (citing *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)). The ALJ need not provide a "written evaluation of every piece of testimony and

33

evidence submitted.   However, a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position."   *Id.* (quoting *Cotter*, 642 F.2d at 705).   An ALJ "cannot 'pick and choose' only the evidence that supports his position."   *Kester v. Astrue*, No. 3:07cv00423, 2009 WL 275438, at *9 (S.D. Ohio Feb. 3, 2009) (citing *Loza v. Apfel,* 219 F.3d 378, 393 (5th Cir. 2000); *Switzer v. Heckler,* 742 F.2d 382, 385-86 (7th Cir. 1984); *Kuleszo v. Barnhart,* 232 F.Supp.2d 44, 57 (S.D.N.Y. 2002)).

Plaintiff has not shown that the ALJ failed to consider the record as a whole.   The ALJ considered the medical evidence of plaintiff's impairments and the opinions offered by the various treating, examining and nonexamining medical sources in assessing plaintiff's credibility and fashioning the RFC.   The ALJ addressed the opinion of plaintiff's treating pulmonologist, Dr. Malik, as to the limitations imposed by plaintiff's respiratory impairments and articulated her reasons for failing to credit that opinion.   Plaintiff contends that the ALJ failed to consider respiratory symptoms he suffered, including cough, dyspnea, drainage, wheezing, congestion and enlarged lymph nodes, and the large number of upper respiratory infections for which he was treated.   However, plaintiff has not cited any evidence of record to show that his symptoms were attributable to Alpha-1 antitrypsin deficiency or to support a finding that the respiratory symptoms he suffers are debilitating.   In addition, the ALJ included plaintiff's shoulder pain among his severe impairments, and plaintiff has failed to point to evidence of additional limitations imposed by his shoulder impairment that the ALJ failed to take into account.   The ALJ also thoroughly discussed the evidence of plaintiff's psychological impairments as set forth

34

above. In addition, the Court has addressed plaintiff's allegations that the ALJ improperly determined he was abusing prescription drug medication and that the ALJ failed to properly consider plaintiff's complaints of back pain. For these reasons, plaintiff's third assignment of error should be overruled.

### 4. Allegations of error pertaining to the ALJ's RFC finding.

Plaintiff alleges as his fourth assignment of error that the ALJ erred by failing to call a medical expert to explain the medical evidence related to his Alpha-1 antitrypsin deficiency. Plaintiff alleges that it is clear from the record that the ALJ misunderstood the nature of Alpha-1 antitrypsin deficiency, which plaintiff explains "is a genetic condition which directly causes emphysema/COPD and liver damage." (Doc. 11 at 26). Plaintiff contends that the ALJ demonstrated her misunderstanding of the condition by finding separate "severe" impairments of Alpha-1 antitrypsin deficiency and a "respiratory impairment" or emphysema (Tr. 19) and by focusing on the absence of "active signs of infection on chest x-rays." (Tr. 23). Plaintiff asserts that he is not alleging that he has a respiratory impairment that is separate from Alpha-1 antitrypsin, but instead he is alleging that his genetic condition caused his emphysema and that the genetic condition is linked to his reduced immune system and frequent upper respiratory infections. Plaintiff asserts that the ALJ's failure to understand that his conditions are linked raises questions about what else she misunderstood about his conditions and demonstrates that she should have requested the assistance of a medical expert to explain the evidence related to his Alpha-1 antitrypsin deficiency. Plaintiff contends that the ALJ's RFC finding is tainted by her

misunderstanding of the medical issues in this case and is therefore not supported by substantial evidence.

An ALJ may "ask for and consider opinions from medical experts on the nature and severity of [the claimant's] impairment(s) and on whether [the] impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart." *Burlingame v. Astrue,* No. 2:11-cv-817, 2012 WL 2953057, at *6 (S.D. Ohio July 19, 2012) (King, M.J.) (Report and Recommendation) (citing former 20 C.F.R. § 404.1527(f)(2)(iii))[4], *adopted,* 2012 WL 3879953 (S.D. Ohio Sept. 6, 2012) (Sargus, J.).   The primary reason an ALJ may elicit the opinion of a medical expert is to obtain "information that will help the ALJ evaluate the medical evidence in a case and determine whether the claimant is disabled. . . ." *Id.* (citing HALLEX I-2-5-32 (September 28, 2005)).   The main function of a medical expert is to explain medical terms and findings in medical reports in more complex cases in terms that the ALJ, who is not a medical professional, may understand. *Id.* (citing *Richardson,* 402 U.S. at 408).

An ALJ's decision as to whether a medical expert is necessary is inherently discretionary. *Id.*, at *7 (citing HALLEX I-2-5-32).   An ALJ abuses her discretion only when the testimony of a medical expert is "required for the discharge of the administrative law judge's duty to conduct a full inquiry into the claimant's allegations." *Id.* (citing 20 C.F.R. § 416.1444; *Haywood v. Sullivan,* 888 F.2d 1463, 1467-68 (5th Cir. 1989); *Foster v. Halter,* 279 F.3d 348, 355 (6th Cir. 2001) ("An administrative law judge has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary")).

---

[4] The provisions governing medical experts have been redesignated as 20 C.F.R. §§ 404.1527(e) and 416.927(e).

The ALJ may elicit the opinions of a medical expert to provide information on the following matters, among others: whether a claimant's impairment meets a listed impairment; the usual dosage and effect of drugs and other forms of therapy; whether a claimant has failed to follow the prescribed treatment; the degree of severity of a claimant's physical or mental impairment; the clinical significance of findings; conflicts in the medical evidence; the claimant's functional limitations and abilities as established by the medical evidence of record; the etiology or course of a disease and how it may affect the claimant's ability to engage in work activities at pertinent points in time; and the onset of an impairment. *Id*. (citing HALLEX I-2-5-34).

Here, the ALJ did not abuse her discretion by failing to call a medical expert to testify at the administrative hearing to explain the evidence related to plaintiff's Alpha-1 antitrypsin deficiency. The ALJ found that plaintiff has the following severe impairments in combination: "alpha-1-antitrypsin deficiency requiring weekly IV infusion at home; low back pain; and pain in the left shoulder; mood disorder; probable prescription drug abuse; and a respiratory impairment. . . ." Plaintiff has not shown that the ALJ's characterization of his breathing impairment as both a specific impairment and general respiratory impairment demonstrated a misunderstanding of the functional limitations imposed by his Alpha-1 antitrypsin deficiency or prejudiced him in any manner. To the contrary, the ALJ's decision shows that the ALJ considered the medical evidence pertaining to plaintiff's lung impairment, took the medical evidence related to plaintiff's lung impairment into account when fashioning the RFC, and incorporated limitations

to account for his severe impairment. (Tr. 21- avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation). Plaintiff's fourth assignment of error should be overruled.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be **DISMISSED** and **TERMINATED** on the docket of the Court.


Date: _2/1/2013_

Karen L. Litkovitz
United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

STEVE HOLLAND,
    Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:11-cv-849
Barrett, J.
Litkovitz, M.J.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).